Council here for first case on calendar, Prime International versus BP. We'll hear the appellant. You reserved five minutes rebuttal so. Yes, Your Honor. Done. Thank you. May it please the court, I'm David Covell here on behalf of the plaintiffs, the appellants. There's a lot to cover. I'm gonna, if it's okay, begin by First, it's holding on antitrust injury in connection with the Clayton Act and Sherman Act claims. And second, it's holding on extraterritoriality in connection with the CEA claims. I'll then turn to the other two decisions, the first dismissing Statoil under the War on Sovereign Immunities Act and then the dismissal of Stasco for lack of personal jurisdiction. As to antitrust injury, the plaintiffs have identified an illegal anti-competitive practice. They've claimed an actual injury resulting from that practice. They've demonstrated that injury, and it's one that the antitrust laws were designed to prevent. The court erred in a number of ways in its decision on antitrust injury. In the first instance, it redefined the market, plaintiff's definition, finding that the spot market for Brent was not part of the futures market because this was a, quote, benchmark manipulation case, requiring direct incorporation of the dated Brent assessment, that was the manipulated benchmark, into the ICE-Brent index, which is what the Brent futures settle to. You would concede that there is no direct incorporation? I do not concede that, Your Honor. We do not concede that in the least bit. I'll get into that. I thought you were doing that. No, but I'd like to lead with this point, which is that even if the dated Brent assessment was not part of the index, dated Brent, which was manipulated, is still the commodity underlying Brent futures, and the ties between spot and futures have been adequately alleged here. We cite the Sanner case, the Seventh Circuit case, which is directly on point. It found antitrust injury in the cash market when futures were subject to anti-competitive practices, but second, the court did compound its error by finding, as a result, that the dated Brent assessment is not incorporated into the ICE-Brent index, and this is wrong. It is incorporated. So how is it incorporated? Well, first, we allege it. As alleged, Platts is the preeminent price reporting agency, and the dated Brent assessment is by definition used in the calculation of the ICE-Brent index. The price reporting agency, Platts, as we allege, is part of the dated Brent assessment. Defendants concede, joint brief at 52, that the dated Brent assessment could be linked. They offer another quote, as likely alternative, but that's not good enough. But for ICE, they're including published market assessments, so that would certainly include, as you point out, the Platts. That's correct. But it would include other things as well. It could, but Platts is the preeminent one. And when it comes to the oil market, I don't know how, I think this is in the record, but there aren't that many others. There's Argus. That's about it. So you don't have that many price reporting agencies, and they're taking a straight average of these. The ICE-Brent index uses some judgment in deciding what numbers to include and what not. Not, no, not according to his definition. It's a straight average using the price reporting agency's PMRs, their reports. The Statoil's expert expressly conceded this incorporation before he belatedly recanted. That was in the context of the FSIA briefing. But second, ICE Futures itself says that the futures are linked to dated Brent. This is in paragraphs 177 and 178 of our complaint. The reason why they do this is because dated Brent overlaps with the futures that are expiring. This is a little bit different from other futures cases. Can you just explain that? Yes. So in Brent futures, the expiration is on the 15th of the month before the expiration of the futures. So July futures, for example, will expire on June 15th. And I'm going to give you an example. In 2010, we alleged manipulation on the day of futures expiration, June 15th, 2010. On that day, there will be cargoes loading, wet cargoes, dated Brent, loading in July. And what that means is... You're saying on that date, there will be wet cargoes loaded, dated in July? Yes. So for example, on June 15th, 2010, there was a trade during the market on close, and Statoil sold to Stasco, I believe. Yes, sold to Stasco, a cargo loading June 29th through July 2nd. Hetco sold to Morgan Stanley, a cargo loading July 6th to July 8th. Those are two wet cargoes, and those two cargoes are part of the, A, the dated Brent assessment, but they're loading in July. They're part of the July futures, it's quote unquote, BFOE calculation. This is an overlap, and what this means is, there's a process called the EFP, an exchange for physical. On June 15th, I could, if I'm buying a cargo, exchange my July futures and get a dated Brent cargo. Okay? Statoil's expert conceded this point. And it's no wonder that the plaintiffs are able to allege in their complaint that there's a statistical relationship between the dated Brent assessment and the futures. There's a strong connection which essentially converges during expiration, and that's convergence of futures and spot. More broadly, the dated Brent assessment is an essential price discovery tool for futures. The statistical analysis provided in the complaint goes further, Your Honor. It demonstrates the impact on Brent futures of the alleged manipulation. Overall, the studies show a strong manipulative impact on Brent futures during the market on close period. This is from 4 to 4.30 London time. There's an extensive double, I'll call it a double reversal study, that's from paragraphs 224 to 250 of the complaint, which shows statistical significance for a redirection of futures prices during the market on close. What that means is, the consulting expert study, the first three contracts for Brent futures, and they would go, and in a statistically significant way, an aberration, one that was not a random walk, would go up until they got to, generally go up until they got to the market on close, go down during the market on close, and then continue up. Those are the first three contracts, and they would continue that, and that was statistically significant. When the first reversal occurred, it was more likely that a second reversal would occur, and importantly, and this is important for jurisdiction and a number of things, the effect was more pronounced when you did it comparing it to the WTI Brent spread. That's the West Texas Intermediate Crude Oil, which is a very common trade, it's called the ARB, the West Texas Intermediate Trade versus the Brent. And then when you come to the harm to the plaintiffs, plaintiffs have alleged that they were harmed, A, by the descriptive episodes of manipulation in the complaint, but also by the statistical studies. So we've connected the double reversals to plaintiff's trades, along with and corresponding with the descriptive times of manipulation, such as June 15th, 2010. Plaintiffs, this is in the appendix 1077 to 78, it's also in the complaint at paragraphs 429 to 438. So for all of these reasons, defendants' reliance on aluminum two is misplaced. There, this court found germane that plaintiffs there had disavowed participation in any of the markets in which the defendants operated. The court especially noted that plaintiffs had not traded aluminum futures with defendants, or that the aluminum that they purchased was the underlying asset for defendants' futures trades. The contrary facts are present here. Defendants participated in the Brent futures market, and dated Brent is the underlying commodity of Brent futures. The complaint describes defendants trading in Brent futures. The complaint alleges that defendants profited in their futures positions from their manipulation. Now futures trades and futures exchanges trades are anonymous, so these allegations are about as good as they can get at the pleading stage. But the- You've got a stronger case on the New York Mercantile Exchange than ICE. Yeah, I'll turn to, this is probably a question about extraterritoriality, I think. Is that correct, Your Honor? No, I meant with respect to the directness of the relationship. I think the relationship in terms of directness is equivalent. The Brent product, the Brent futures product that trades on NYMEX is identical in terms of its settlement structure to the product that trades on ICE Futures Europe. So they're identical, so in terms of the directness, I think we're talking about apples and apples. It's called a linked contract, they settle to the same terms, so. There's a footnote in the plaintiff's brief that I wonder if you could address. It says that the defendants have different interests with respect to the direction of Brent crude oil. It's footnote 13 on page 29. And thus, no particular price movement would uniformly benefit the defendants as a group. Moreover, each defendant could have multiple different Brent-related positions at any given time, which explains why plaintiffs have not mustered anything more than insufficient conclusory allegations that the defendants benefited from the alleged conduct. Could you translate that for me or explain it to me? It's simple. Is it true? We've alleged in our complaint that certain traders are intermediaries, trading operations. Certain of the participants in the market on close are the big oil companies like Shell, Statoil, and BP. They are going to, and we admit it, are going to have different interests at different times. That does not mean they are not going to conspire when it suits their interests and when their interests correspond. And that's our allegation. We make it very clear that this isn't one conspiracy that is going to continue from day one to day 30. And it's going to always be the same. It's going to take different forms at different times. And the allegations we make, though, are very clear that during certain times, it was in all of the party's interest to coordinate, to get the price of the market on close down, dated Brent and the market on close down. Is that a fair answer? On extraterritoriality, I've got to move quickly because I have three minutes and a lot to cover. Under Morrison, absolute activists, and Choi, this case is not impermissibly extraterritorial. As to the part two, irrevocable liability of the inquiry, there's no dispute that there's a meeting of the minds for trades on Ice Brent Futures, sorry, Ice Futures Europe. The meeting of the minds occurs in Chicago, or in Aurora, Illinois, in Illinois. Ice Brent Futures- Meeting of the minds between whom? The buyer of the future and the seller of the future. And in this case, unlike Choi, and the clearing house. The clearing house rules, rule 401, says at the moment of matching, automatically two contracts arise, one between the buyer and the clearing house, and one between the seller and the clearing house. And then trading rule 3.92, which is in the record A1116, shows there's no right of withdrawal from this match contract. This is unambiguous, irrevocable liability that is occurring in Illinois. And it's clearly consistent with Choi. And unlike Choi, you've got the two contracts forming, including the ones with the clearing house. And that was a question that was left open in Choi. I'll turn to the domestic exchange argument really briefly. Defendants concede that NYMEX is a domestic exchange. They also concede that the language of the Commodity Exchange Act is about trading on a registered entity or subject to the rules of a registered entity. Notably, Choi left open how to interpret what domestic exchange means under the terms of the Commodity Exchange Act. But Ice Futures Europe is, without question, subject to the rules of a registered entity. Its clearing house is Ice Clear Europe, which is a derivatives clearing organization under the Commodity Exchange Act. Ice Futures Europe's contract rules all refer directly to- Statute, when it says registered entity, does it mean registered anywhere or registered in the United States? Registered has a particular meaning. It's registered with the CFTC, I believe. And so that is in the United States, yes. And Ice Clear Europe, without question, is registered to clear contracts in the US. And it's registered to clear contracts for Ice Futures Europe. But it also oversees Ice Futures, sorry, for Ice Futures US. But it also oversees Ice Futures Europe. Ice Futures Europe is allowed to co-mingle its contracts, its customers' contracts, futures contracts, with those of Ice Futures US. And the reason why it's allowed to do that is because it's subject to the rules of the CFTC and the Commodity Exchange Act, and because it's subject to the rules of Ice Clear Europe, which is the clearing house. I'll talk really quickly, I've got 30 seconds, about the Foreign Sovereign Immunities Act and personal jurisdiction. I'll probably talk more about it on rebuttal. Statoil's actions caused a direct effect in the US. PLATS does not act as an intermediating factor, an intervening factor. In contrast to the other cases that are cited, there's no third party that actually harms our clients. What happens with PLATS is exactly the tort at issue here. The reporting to PLATS was the tort, and everything flowed through it. It's unrebutted that PLATS, on the record, that PLATS was not an enforcer of the rules, and it just reported the trades. I'll go to Statoil after this, or Stasco after this. Thanks. May it please the court, Rick Pepperman on behalf of the defendants. I will be addressing the issues common to all the defendants. At the risk of starting in the weeds, I'd like to begin by addressing Judge Jacobs, your question on incorporation, because I do think it's important to understand that the ICE-Brent index and dated Brent assessment are two separate benchmarks. Let me focus on what ICE- You can affect one by affecting the other. Your Honor, I- If it's incorporated. No, it is not incorporated. I think that there can be correlation between the two, because they both relate to the underlying commodity, but there is not causation. Let me explain why. First of all, what is the ICE-Brent index? The ICE-Brent index is relevant only on one day. If the holder of one of the futures contracts holds the futures contract to expiration and then elects the cash settle, the ICE-Brent index is used to calculate the cash settlement amount. It's only relevant on that one day. So what is it? The ICE-Brent index takes into account average and weighted average of BFOE forward contracts over a two month period. And then also considers published assessments of BFOE forward contracts. And BFOE forward contracts are different from dated Brent. What a BFOE forward contract is, is you have a contract to take delivery of Brent crude oil in a specific month. However, the delivery date is not specified and the specific grade of Brent crude oil is not satisfied, whether it's B, F, O, or E. So a BFOE forward contract- Are those different grades separately reported by Platts? They are not. Platts reports at least five different Brent-related indices. The dated Brent index- The dated. The dated Brent index is only one. But your honor, the published market assessments that's considered in the third factor is the published market assessments of cash BFOE, BFOE forward markets. Platts does have a benchmark to BFOE forwards, which is different from dated Brent. And in addition, there are four separate publishers of Brent-related benchmarks. There's Platts, there's Argus, there's ICIS, there's Reuters. Since 2015, ICE has specified which published assessment it uses. And since 2015, it's been the ICIS assessment of BFOE forward contracts. So there's a mixing of apples and oranges between the cash BFOE forward market and dated Brent. And this is clear from paragraphs 178 and 179 of the complaint, which talk about, in terms of the prices that are considered, that it's BFOE forwards. So what you have, your honor, at most is, and this is the plaintiff's theory of the case, that there was alleged manipulation of the underlying physical commodity. And that had effects that flow throughout or ripple throughout both the physical market and all derivatives tied to Brent crude. And this theory of the case is what's pled in paragraph nine and paragraph 126. And it makes this case, your honor, much more similar to the Second Circuit's decision in May in the Harry case than it does the Sanner case from 1995 in the Seventh Circuit. In the Harry case, where there was manipulation at three regional hubs, but the plaintiffs purchased their derivatives on a fourth hub, the Henry hub. And the claim was that the manipulation had shockwaves that went throughout the physical and derivatives market. In Harry, the court said that's not enough to give rise to antitrust standing. And this makes this case very different from the Gelboim case. Because in the Gelboim case, which- It is the case, is it not, that derivatives are much more price sensitive to this kind of manipulation than transactions in the liquid oil? Well, your honor, of course- Am I correct? I mean- No, of course the cash market or the physical market is closely related to the derivative market. It is related. Right, but your honor, the way I look at it is that if you sought to manipulate Brent Futures prices on NYMEX or on ICE Futures Europe, you wouldn't go about that manipulation by manipulating a benchmark that's not even incorporated in it. And it's also a benchmark that's only relevant on one day for the tiny percentage of futures traders who hold the futures to expiration rather than closing it out through an offsetting trade. And only relevant, only relevant if they elect to cash settle as opposed to physically settle. So also on motivation, and I think this goes in part to Judge Corman's question about the footnote in the plaintiff's briefs about the defendant's different positions in the different market. What's striking here is although in their briefs they claim that this is a case to manipulate futures prices traded on NYMEX or ICE Futures Europe. If you look at their complaint, for example, paragraph 533, when they talk about the motivation. They say that defendants sought to enhance the value of their financial or derivative or physical positions and improve the price of purchase or sales organizations. And then they go on in paragraph 536 to expressly ledge factors motivating defendants manipulation varied among defendants and may have changed at times during the class period. And that's because what they've alleged as the conspiracy here are this disparate group of defendants who are oil producers, oil refiners, oil distributors, and some trade derivatives contracts. And that results in this very amorphous theory of motivation. And indeed, which makes this case, Your Honor, very different from Gelboim. This is not a straight horizontal price fixing case, where you have horizontal competitors agreeing to fix a benchmark that then is incorporated into other transactions. There's no agreement among horizontal competitors here to fix a benchmark. And the plaintiffs here traded futures that settled into a different benchmark. And it can't be for purposes of antitrust standing that just because benchmarks are correlated because they both relate to the same underlying physical commodity that there's a sort of direct restraint or direct injury that this court has looked for antitrust standing. And I will say on the extraterritoriality point, this case is governed by this court's decision in Park Central, where the court held that the existence of a domestic transaction or a trade on a domestic exchange is necessary but not sufficient to render the conduct domestic. And- There was a trade on a domestic exchange. It's just it was relative to a stock being traded on a German exchange. Right, in that case, it's on a German exchange. But the transactions at issue in that case were domestic transactions. Here, the plaintiffs, when they traded on NYMEX, those would be domestic transactions. But all of the conduct, all the defendant's conduct occurred entirely abroad. And the defendants aren't accused of having engaged in manipulative trading on a domestic exchange. And to Judge Sullivan's point, there is a fundamental difference between NYMEX and ICE Futures Europe. It's only NYMEX that's a registered entity, such that the relevant provisions of the Commodities Exchange Act would apply to it. ICE Futures Europe is not a registered entity. And indeed, the amazing thing about this is during the four months that the plaintiff's complaint focused on, volume wise, only 1.1% of the trades occurred on NYMEX. This is all about ICE Futures Europe. And the argument that there's a registered entity here because ICE Clear Europe is a registered entity does not work. Because the rules at issue here aren't the rules that apply to clearing entities, they're the manipulation rules that apply to the exchanges. Thank you, Your Honor. Thank you. May it please the court. David Lesser from WilmerHale for Statoil. Mr. Covell only said one thing about Statoil and the FSIA issue, but it was important. He said, Statoil's reporting to Platts was the tort. Statoil is located in Norway and Platts is in London. And under this court's decisions in Atlantica and virtual countries, if the locus of the tort, if the conduct that constitutes the grabment of the suit, takes place abroad, then the commercial activity exception doesn't apply. That ends the inquiry. Just to step back for a moment, the commercial activity exception is narrow and carefully patrolled. And it applies only when the extra-territorial, when the domestic effect is the immediate consequence of foreign conduct. In virtual countries, the court explained that ripples caused by an overseas transaction that reach US shores don't suffice. And an effect is not direct when it falls at the end of a long chain of causation mediated by numerous actions of third parties, I'm quoting virtual countries. But where do you get these numerous mediating ripples? So here, plaintiffs allege that the ripple effects in the United States were caused by conduct in the North Sea that was mediated through, first, the Platt's assessment of the physical market for dated Brent in the North Sea. And then through the Ice Brent Index, which is a proprietary index that refers to incorporation of designated assessments. It doesn't actually say that incorporates the Platt's dated Brent assessment. And then ultimately, through the market for plaintiff's Ice Brent futures, which trade at a market price and an expiration settled to the Ice Brent Index, not the dated Brent assessment. Plaintiffs allege that there's a correlation between the dated Brent assessment and prices of futures of 85%, they say most of the time it's over 90%. But that can't possibly suffice to satisfy the immediate consequence requirements for the commercial activity exception. The last point I'd like to make is that all of plaintiff's injuries, as alleged in the complaint, relate to alleged manipulation of the dated Brent assessment. The paragraphs in the complaint from 429 to 438 all refer to the dated Brent, which the complaint defines in paragraph 61 as the assessment. And so there's no other more direct theory by which they allege any injury. It's the mediation through those various steps that I described, all of which constitute independent elements under virtual countries. Akin to the press in virtual countries that reported a press release from the government of South Africa. In fact, here there are many more steps than there were in virtual countries. I have more time, but if the court has no questions, I'll sit down. Thank you. Thank you. Good morning. Good morning, your honors. May it please the court, I'm David Salmons on behalf of Shell International Trading and Shipping Company, or Stasco. If this court reaches the issue, it should affirm the district court's holding that it lacked specific personal jurisdiction over Stasco for two primary reasons. The first is that plaintiffs cannot satisfy the general test for specific personal jurisdiction, purposeful availment, because they cannot identify any suit related conduct in the US that has given rise to their claims. This court's recent decision in Charles Schwab involving alleged LIBOR manipulation is instructive here. The court rejected personal jurisdiction because even though there were some US transactions potentially attributable to the foreign defendants, those US transactions had not caused the plaintiff's injuries. It was not enough that there were effects in the United States on US transactions from the foreign conduct. And it was not enough that the defendants had allegedly intended to profit from the US transactions. To be suit related, the defendants US transactions had to actually cause the plaintiff's injuries. And plaintiffs cannot satisfy that standard here. As the district court rightly held, all of their claims against Stasco are premised on its submission to a foreign benchmarking service. That foreign conduct alone is the source of their claimed injuries, not any trades on a US exchange by a US affiliate. Now as we explain in our brief, there is no basis to disregard the company's separate corporate form. But putting that fatal problem aside for a moment, even considering those US trades by the US affiliate, there is still no suit related conduct in the US, and I think that's best illustrated by this simple fact. Plaintiff's alleged injuries and their claims would be identical if there were no trades on US exchanges by an affiliate of Stasco. So the US trades are not causally related to their claims, and therefore, under Schwab, they are not suit related, and there is no purposeful availment under any circumstances. So the second reason the court should affirm is that plaintiffs cannot satisfy the limited exception to purposeful availment known as the effects test because that requires that the defendant's conduct is expressly aimed at the US or has the US as its focal point. Again, it's not enough that the US effects were foreseeable or that foreign conduct was motivated in part by US profits or effects. This court's decision in Waldman, we think, is a good example of this. There, the court held that there was no personal jurisdiction involving terrorist attacks in Israel, even though it was alleged that part of the motivation for those attacks was to affect US policy. Since Israel and not the US was the nucleus of the harm, that's one of the phrases the court used there, and the focal point of the attacks. And in Schwab, the court again held that the mere fact that defendants intended to earn profits in the US was not enough. Here, the allegations in the complaint and the jurisdictional discovery make clear that the nucleus of the harm and the focal point of the alleged manipulation was Europe. It is in Europe where the physical oil transactions occurred, the reporting to Platts occurred, the production of the dated Brent assessment occurred, and the future and derivative trading on ICE Futures Europe all occurred. So for these reasons, we ask the court to affirm on personal jurisdiction. I'm happy to address any questions the court has or to get more detail on why the agency theory that's been asserted is not sufficient to attribute those contacts to the European affiliate, Stasco. But I think the absence of any actual suit-related conduct is sufficient to affirm. Thank you. Thank you. Thank you, your honor. The suit-related conduct does include trading on futures. I want to draw back for a second. The ICE Brent index is reported every day. So it's not something that's only applicable at settlement. But I would also like to get to a finer point, which is best illustrated by an example. And it applies to Stasco, it applies to Statoil, it applies to all of these points. And this is the June 15th, 2010 episode. It was an expiration of futures. The fact that this alleged manipulation occurred on the day of future settlement shows a directed intent, at least plausible on a pleading, to affect futures. Okay, so you've got here two trades, one between Stasco and Statoil, and one between Hetco and Morgan Stanley. They affected the data Brent assessment. And those trades, as I said before, could have been EFP'd into July futures. So there is a convergence in theory, but more than just theory. On June 15th, 2010, there was a double reversal, a statistical anomalous kind of move. What the consulting expert did was find the first three months went up until the market unclosed. And then when these sales, which drove down the data Brent index 16 cents from the day before. Then the three contracts went down. And then afterward, afterward what happened? Well, if it's a double reversal, they all should go up. No, only the second and third month went up. The first month was the July futures. It stuck. The reason why it stuck was because it settled to the ICE Brent index. That is a directed action at futures. And that's not the only example. There are other examples of expiration dates. Why can't that just be a phenomenon associated with the fact that markets fluctuate? It can in theory, but on a plausibility standard. And if the statistical analysis that was done showed that this is not a random walk. That this happens especially between the WTI Brent spread in a way that is not statistically random, that is statistically anomalous. And so any one day when there's a double reversal, yes, in theory it could. But in this case, it corresponds directly to allegations in the complaint that these trades were meant to drive down the price of Brent. And for the purpose of futures. The data Brent assessment is a manipulation of dated Brent. It's a manipulation of dated Brent, and that affects the underlying commodity every day. And that is used as a marker, as a price discovery mechanism for all traders of Brent futures. Stasco is simplifying things unnecessarily when it says that there is no suit related conduct in the US. Stasco's Mike Muller controlled Stasco's crude oil traders. If you're manipulating settlement, you have to coordinate your, or the futures in general, you have to coordinate your positions. That's why it's not just a derivative position, it's got to be futures over the counter and futures as well. They can't have the crude oil traders in the US, Stasco, making countervailing trades. You have to coordinate in order for these to be profitable. That is an episode in suit that's suit related conduct. The effects test applies both in the Foreign Sovereign Immunities Act context, because the conduct is directed at the futures market and in the context of personal jurisdiction for Stasco. And I would note that these trades involve both of those parties. As to Park Central, again, this is a case that is more on point with Choi. Park Central, the issues animating Park Central primarily were that Volkswagen wouldn't know about the conduct in the United States, wouldn't have any foreseeability about it, wouldn't profit from it. Here it's a completely different issue. Here we have alleged that the plaintiffs were harmed and that the defendants directed their conduct at the futures market. That's very different from what happened in Park Central. That the conduct was directed at the futures market worldwide? I would say it was here and it was directed to ICE Futures Europe and to NYMEX. But the reason why it's important for NYMEX is because one of the most, the riskless but as well profitable trades is the WTI Brent spread. The WTI Brent spread necessarily involves NYMEX. So it was directed as easily at the United States. It was part of, the United States was a necessary part of that scheme to make money, especially. And if you look at the statistical analysis, you'll see that the WTI Brent spread was more affected than even the outright Brent. My question is whether the ripples that your adversaries are talking about are 360 degrees, they go out to everywhere in the world where people are trading these things. Or whether, as you're arguing, I think, there's one ripple and it's directed at the United States. Well, it's not a ripple, first of all, Your Honor. I understand. But it's directed at, it can be directed at a couple of places. It doesn't have to be directed just at the United States, but it is directed at the United States. It has to be, as I said, because you can't have a position in WTI Futures that would be countervailing to your ICE Brent Futures position, your Brent Futures position. It can't have that. Thank you. Thank you, Your Honor. Thank you all. We'll reserve decision.